IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dana L. Helms, | ) | C/A No.: 1:15-1867-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On March 12, 2013, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on November 10, 2011. Tr. at 91, 137, 237–39. Her applications were denied initially and upon reconsideration. Tr. at 157–61, 164–65,

166–67. On September 26, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ann Paschall. Tr. at 41–67 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 21, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 19–40. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 4, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 44 years old at the time of the hearing. Tr. at 46. She completed the ninth grade. *Id.* Her past relevant work ("PRW") was as a convenience store manager. Tr. at 61. She alleges she has been unable to work since December 1, 2012.[1] Tr. at 45.

2.    Medical History

Plaintiff underwent electromyography ("EMG") and nerve conduction studies ("NCS") at Neurologic Care of Spartanburg, P.A., on March 29, 2011. Tr. at 419. The tests showed generalized, axonal, sensory-motor peripheral polyneuropathy and superimposed mild left carpal tunnel syndrome. *Id.*

On March 31, 2011, a polysomnography interpretation report indicated Plaintiff had mild obstructive sleep apnea. Tr. at 420. Thomas Collings, M.D. ("Dr. Collings"),

---

[1] At the beginning of the hearing, Plaintiff's attorney moved to amend her alleged disability onset date to December 1, 2012. Tr. at 45.

recommended Plaintiff obtain a repeat polysomnography study with positive airway pressure titration and close clinical follow up; optimize sleep hygiene measures; avoid sleep deprivation; avoid dangers of driving while excessively drowsy; and manage her weight. *Id.*

Plaintiff underwent a second polysomnography on April 21, 2011, which showed her obstructive sleep apnea to be resolved with use of a CPAP machine. Tr. at 421. Dr. Collings recommended Plaintiff use a home CPAP machine at the settings determined to be effective during testing. *Id.*

On November 6, 2012, Plaintiff complained to Coy L. Eaton, M.D. ("Dr. Eaton"), of pain in her legs and muscles. Tr. at 348. Dr. Eaton indicated Plaintiff's diagnoses included neuropathy, fibromyalgia, and chronic anxiety disorder. *Id.* He increased Plaintiff's dosage of Neurontin to 400 milligrams every six hours. *Id.*

Plaintiff followed up with Dr. Eaton on November 28, 2012, for myalgias and anxiety attacks. Tr. at 346–47. Dr. Eaton noted that Plaintiff's recent drug screen showed no evidence that she was taking Lorazepam. Tr. at 346. Plaintiff stated she stopped taking the medication during the time that she was watching a young niece because she did not want for the medication to affect her cognition. *Id.* She indicated she had subsequently resumed the medication. *Id.*

Plaintiff followed up with Dr. Eaton on May 27, 2013. Tr. at 369. She reported diffuse joint pain and paresthesias in her hands and feet. *Id.* She complained of loose bowels and abdominal cramping, but stated her symptoms were improved by Imodium. *Id.* She reported stable blood pressure and reflux symptoms and improved anxiety

disorder. *Id.* She denied exertional chest pain and shortness of breath. *Id.* Dr. Eaton observed that Plaintiff could move all four extremities, but had pain with range of motion ("ROM") of her neck and back. *Id.* He assessed degenerative joint disease with fibromyalgia and neuropathy, hypertension, anxiety disorder, and possible irritable bowel syndrome. *Id.* He stated Plaintiff's medications for degenerative joint disease, fibromyalgia, and neuropathy provided her some relief, but that she continued to experience symptoms. *Id.* Dr. Eaton instructed Plaintiff to follow up in six months and to continue her current therapy. *Id.*

On June 17, 2013, Plaintiff presented to Edwin O. Byrd, III, M.D. ("Dr. Byrd"), for a consultative examination. Tr. at 358–60. She complained of pain in her knee and bilateral feet. Tr. at 358. Dr. Byrd indicated Plaintiff was diagnosed with idiopathic neuropathy and fibromyalgia. *Id.* He stated Plaintiff had decreased shrug and ROM of her upper and lower extremities, but that her results were affected by her poor effort on the testing. Tr. at 359. He indicated Plaintiff had normal gait, no nerve deficits, and normal vibration and sensory exams in her lower extremities. *Id.* He noted Plaintiff had somewhat slow patellar reflexes. *Id.* Dr. Byrd stated Plaintiff was very depressed, cried, and demonstrated a flat affect and mild distress. *Id.* He indicated Plaintiff gave clear answers and that her knowledge was within normal limits. *Id.* He indicated Plaintiff could name three objects without difficulty and was able to subtract by threes from 100 slowly, but without much difficulty. Tr. at 360. He stated Plaintiff's computation was okay and that she was able to correctly compute change for a scenario involving a monetary transaction. *Id.* He indicated Plaintiff demonstrated normal abstract thinking ability. *Id.*

4

Dr. Byrd assessed diagnoses of medication-controlled hypertension, idiopathic peripheral neuropathy, anxiety, and history of nephrolithiasis. *Id.* He indicated Plaintiff probably needed therapy for her anxiety. *Id.* He acknowledged that Plaintiff endorsed a diagnosis of fibromyalgia and was prescribed narcotic pain medications, but stated that a two-point discrimination test did not lead him to suspect that she had fibromyalgia. *Id.*

Plaintiff presented to James N. Ruffing, Psy. D. ("Dr. Ruffing"), for a consultative examination on June 18, 2013. Tr. at 363–65. Dr. Ruffing observed that Plaintiff was calm during the initial portion of the interview, but became somewhat shaky and tearful near the end. Tr. at 364. He indicated Plaintiff's speech was spontaneous, responsive, articulate, and fluent. *Id.* Plaintiff endorsed emotional and neurovegetative symptoms of depression that included crying spells, negative emotional state, no libido, low energy, and inability to fall asleep. *Id.* She complained of anhedonia and thoughts of death, without a specific suicidal intent or plan. *Id.* She was fully oriented and had relevant, coherent, and goal-directed thought processes. Tr. at 365. Dr. Ruffing indicated that Plaintiff's ability to attend and focus was inconsistent. *Id.* Plaintiff demonstrated normal cognitive processing speed. *Id.* She was able to recall three of three words immediately, but only one of three after a five-minute delay. *Id.* She scored 30 of 30 points on the Folstein Mini-Mental State Exam ("MMSE"), which reflected normal mental status functioning. *Id.* Dr. Ruffing assessed generalized anxiety disorder and adjustment disorder with depressed mood. *Id.* He provided the following impression regarding Plaintiff's capacities:

> She was able to understand and respond to the spoken word. She seems to have inconsistent ability to focus and attend secondary to her emotional distress level. She may struggle with concentration, persistence, and pace. She does appear capable of managing her finances, if awarded benefits.

*Id.*

State agency medical consultant Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), reviewed the medical evidence and completed a physical residual functional capacity ("RFC") assessment on July 11, 2013. Tr. at 98–100. He indicated Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour day; frequently push and/or pull with her lower extremities, climb ramps and stairs, balance, kneel, crouch, and crawl; occasionally stoop and climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to hazards. *Id.* On October 11, 2013, Matthew Fox, M.D., assessed the same limitations as those assessed by Dr. El-Ibiary. Tr. at 129–31.

State agency consultant Craig Horn, Ph. D. ("Dr. Horn"), reviewed the record and completed a psychiatric review technique form ("PRTF") on July 14, 2013. Tr. at 96–97. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and determined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Horn indicated Plaintiff "has ability for at least simple routine tasks away from public." Tr. at 97. He completed a mental RFC assessment on July 15, 2013, and indicated Plaintiff was moderately limited with regard to the following abilities: to carry out detailed instructions; to maintain

attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; and to interact appropriately with the general public. Tr. at 100–02. Dr. Horn found that the following abilities were not significantly limited: to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; and to adhere to basic standards of neatness and cleanliness. *Id.*

On October 11, 2013, state agency consultant Larry Clanton, Ph. D. ("Dr. Clanton"), reviewed the medical evidence and completed a PRTF. Tr. at 126–28. He considered Listings 12.04 and 12.06 and found that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Clanton also completed a mental RFC and indicated Plaintiff was moderately limited with regard to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to interact appropriately with the general public.

7

Tr. at 131–33. He indicated Plaintiff was not significantly limited with regard to the following abilities: to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. *Id.* He found that Plaintiff "has ability for at least simple routine tasks away from public." Tr. at 133.

On January 13, 2014, Plaintiff presented to the emergency department at Village at Pelham with a complaint of left-sided neck pain that radiated to her left upper chest. Tr. at 376. She indicated the pain was accompanied by severe epigastric pain, nausea, and chills. *Id.* Her blood pressure was elevated and she had an abnormal nuclear stress test. *Id.* She was transferred to Spartanburg Regional Hospital on January 15, 2014, after a myocardial infarction was ruled out. *Id.* A heart catheterization revealed normal left ventricular systolic function and mild disease in the distal right coronary artery. Tr. at 422. David Ike, M.D., recommended management of Plaintiff's coronary artery disease with a statin medication and low-dose aspirin. *Id.*

Plaintiff followed up with Dr. Eaton on March 10, 2014. Tr. at 415. She denied exertional chest pain, but reported chronic pain in her arms and legs. *Id.* Dr. Eaton indicated Plaintiff's hypertension and anxiety disorder were stable and that she remained on chronic therapy for degenerative joint disease with fibromyalgia and neuropathy. *Id.*

Plaintiff underwent EMG and NCS on January 28, 2015. Tr. at 9. The testing revealed mild left median motor and sensory neuropathy consistent with a possible mild left carpal tunnel syndrome; mild-to-moderate right median sensory neuropathy in the right wrist; and +1 fibrillation potential in the right flexor carpi radialis muscle, which suggested a possible subacute right C6 radiculopathy. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 26, 2014, Plaintiff testified that she lived in a mobile home with her husband and 15-year-old son. Tr. at 46. She indicated she had a driver's license and was able to drive. Tr. at 47. She stated she had worked as a convenience store manager. *Id.* She indicated she stopped working in November 2011 because of burning pain in her feet that had begun six to eight months earlier. Tr. at 48, 56. She stated she had requested light duty, but her employer denied her request. Tr. at 56.

Plaintiff testified that her feet burned any time she wore shoes or socks. Tr. at 49. She stated her foot pain increased when she was lying down. *Id.* She indicated she had no feeling in her feet. *Id.* She stated she once impaled her foot with a toothpick and did not feel the wound itself, but only waves of pain radiating through her foot. Tr. at 49–50. She

indicated her fibromyalgia caused her to experience constant pain throughout her body. Tr. at 50. She testified she had sleep apnea and used a CPAP machine. Tr. at 53. She indicated she experienced back pain that radiated down both her legs. *Id.* She stated she had chronic high blood pressure and a blockage in her heart. Tr. at 54. She indicated she was also diagnosed with anxiety. Tr. at 55.

Plaintiff testified she was unable to afford regular treatment from a neurologist. Tr. at 60. She stated the free clinic would not see her because she had a regular doctor. *Id.* She indicated she put money aside to be able to see Dr. Eaton, but that she had to cancel a few appointments because she did not have the money to pay for the visits. *Id.* She stated Dr. Eaton prescribed the same medications that the neurologist had prescribed for her neuropathy. *Id.* She indicated Dr. Eaton sometimes gave her samples of medications that she could not afford to purchase. Tr. at 60–61.

Plaintiff testified that she had difficulty sleeping because of the pain in her feet. Tr. at 50. She indicated she sometimes slept for three hours before being awakened by burning in her feet. *Id.* She stated she sometimes went back to sleep for a few hours after making breakfast for her son. *Id.* She indicated she sometimes fell asleep while sitting still. Tr. at 50–51. She endorsed worsened visual acuity as a result of taking Neurontin. Tr. at 51.

Plaintiff testified her ability to sit varied. Tr. at 52. She stated she could stand and walk for a maximum of 10 minutes at a time. Tr. at 53. She indicated she began to feel hot and to sweat if she stood for too long. *Id.*

Plaintiff testified she sometimes drove her son to school. Tr. at 51. She stated she did some household chores, including dishes and laundry, but took frequent breaks. *Id.* She indicated it was difficult for her to get in and out of her bathtub. Tr. at 52. She indicated she did not participate in activities outside her home. Tr. at 55.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Janette Clifford reviewed the record and testified at the hearing. Tr. at 61–66. The VE categorized Plaintiff's PRW as a composite job that reflected the following job descriptions: a convenience store manager, *DOT* number 185.167-046, classified as light with a specific vocational preparation ("SVP") of seven; a store manager, *DOT* number 922.687-058, classified as medium with an SVP of two; and a cashier/checker, *DOT* number 211.462-014, classified as light with an SVP of three. Tr. at 61–62. The ALJ asked the VE if an individual who was limited to sedentary and unskilled work could perform Plaintiff's PRW. Tr. at 63. The VE responded that the individual could not. *Id.* The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited to a maximum of sedentary work; could lift 10 pounds occasionally and less than 10 pounds frequently; could occasionally use the bilateral legs for pushing, pulling, or operating foot controls; could not use ladders or be exposed to dangerous machinery or unprotected heights; could occasionally stoop; could frequently crouch, kneel, crawl, balance, and climb stairs; could perform simple, repetitive tasks and instructions; and could perform jobs with no more than occasional public contact. Tr. at 63–64. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. Tr. at 64. The VE identified

sedentary jobs with an SVP of two as an inspector, *DOT* number 669.687-014, with 130,317 positions nationally; a surveillance system monitor, *DOT* number 379.367-010, with 120,250 positions nationally; and an assembler, *DOT* number 713.687-018, with 160,815 positions nationally. *Id.* The ALJ asked if any of the jobs that the VE described would allow an individual to change positions between sitting and standing every 30 minutes while remaining at the work station. *Id.* The VE indicated all three of the jobs would accommodate the additional restriction. *Id.* The ALJ asked the VE to assume the individual would be unable to consistently work eight hours a day, five days a week or would miss three or more days per month because of chronic pain and anxiety. Tr. at 65. She asked if any jobs would be available. *Id.* The VE testified there would be no jobs available. *Id.* The ALJ asked the VE to assume the individual could not maintain attention or focus for as much as two hours at a time or would require more than a 15-minute morning break, a 30-minute lunch break, and a 15-minute afternoon break. *Id.* She asked if the jobs previously identified or any other jobs would be available. *Id.* The VE indicated an individual would have to pay attention for a minimum of two hours at a time to perform unskilled work. *Id.* The ALJ asked the VE if her testimony was consistent with the *DOT*. *Id.* The VE testified that her testimony was consistent with the *DOT*, except that the *DOT* did not address changing positions or breaks and that her testimony regarding the effect of changing positions was based on her 24-year history of working in industrial rehabilitation and with employers in industries. Tr. at 65–66.

2.    The ALJ's Findings

In her decision dated November 21, 2014, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: obesity, peripheral polyneuropathy, lumbar and thoracic degenerative disc disease, sleep apnea, anxiety, and depression (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can occasionally use her bilateral lower extremities to push/pull/operate foot controls; she cannot climb ladders or be exposed to dangerous machinery or unprotected heights; she can occasionally stoop; she can frequently balance, climb ramps/stairs, crouch, kneel, and crawl; she is limited to simple, repetitive tasks and instructions in jobs with occasional public contact; and she requires a sit-stand option with the ability to change position every 30 minutes while remaining at the work station.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 20, 1970 and was 42 years old, which is defined as a younger individual age 18–44, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 24–34.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ's hypothetical questions to the VE and RFC finding did not reflect all of Plaintiff's limitations; and

2) the ALJ did not adequately consider Plaintiff's treating physician's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

14

(discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Moderate Limitation in Concentration, Persistence, or Pace

Plaintiff argues the ALJ erred by failing to include restrictions pertaining to her moderate limitation in concentration, persistence, or pace in the hypothetical question posed to the VE. [ECF No. 11 at 13]. She maintains the ALJ's restriction to simple, repetitive tasks and instructions in jobs with occasional public contact did not adequately reflect her limitation. *Id.* She contends that the ALJ's error was the same as that determined to be improper in *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). *Id.*, ECF No. 13 at 2–4.

17

The Commissioner argues that the ALJ properly relied upon the opinions of Drs. Horn and Clanton to conclude that Plaintiff could perform simple, repetitive tasks with occasional public contact. [ECF No. 12 at 8–9]. She maintains Plaintiff has oversimplified the court's holding in *Mascio*, and that the ALJ provided a sufficient explanation as to the implications of a moderate limitation in concentration, persistence, or pace. *Id.* at 11.

If a claimant alleges disability resulting from a mental impairment, the Regulations require that a special technique be used to evaluate the severity of the mental impairment. 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ should first evaluate the individual's symptoms to determine if she has a medically-determinable mental impairment and then rate the degree of functional limitation that results from the impairment. 20 C.F.R. §§ 404.1520a(b), 416.920a(b). The ALJ must consider four functional areas in assessing the individual's degree of functional limitation, which include activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the ALJ finds that an individual has a severe mental impairment, but concludes that her functional limitations are not severe enough to meet or equal a Listing, the ALJ should then proceed to consider the individual's mental functional limitations as part of the RFC assessment. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

To properly assess an individual's RFC, the ALJ must ascertain the limitations imposed by her impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. This typically requires that the ALJ consider the individual's

ability to sustain work-related activities over an eight-hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.*

To be relevant to the ALJ's assessment of a claimant's RFC, the VE's opinion "must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). ALJs have discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but VE testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

In *Mascio*, the Fourth Circuit found that the ALJ erred in assessing the plaintiff's RFC based on an incomplete hypothetical to the VE. Although the ALJ had included adjustment disorder among the plaintiff's severe impairments, he imposed no mental limitations in the hypothetical question to the VE. *Mascio*, 780 F.3d at 637. The court stated that the ALJ's finding that the plaintiff was limited to unskilled work was based on the VE's "unsolicited addition of 'unskilled work'" in response to the ALJ's hypothetical. *Id.* at 637–38.

Pertinent to Plaintiff's argument, the *Mascio* decision states "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638. The court further explained that "the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work . . . [b]ut because the ALJ here gave no explanation, a remand is in order." *Id.* In several recent cases, this court has held that an ALJ adequately accounts for moderate limitations in concentration, persistence, or pace by explaining how this functional limitation was considered as part of the RFC assessment. *See Davis v. Colvin*, No. 0:14-4314-TMC-PJG, 2015 WL 7871172, at *4 (D.S.C. Dec. 4, 2015) ("As discussed above and contrary to the *Mascio* case, the ALJ accounted for Davis's limitations and credibility in determining her RFC prior to proceeding to steps four and five. Further, the ALJ found that any limitation in Davis's concentration, persistence, or pace did not affect her ability to perform simple, routine, repetitive tasks."); *Falls v. Colvin*, No. 8:14-195-RBH, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015) ("As opposed to the hypothetical in *Mascio*, which said nothing about the claimant's mental limitations, the ALJ's hypothetical in this case accounted for each of Plaintiff's mental limitations. The ALJ also accounted for Plaintiff's limitations in the area of concentration when determining Plaintiff's residual functional capacity. The ALJ noted Plaintiff's mental limitations but found that the Plaintiff could 'concentrate, persist and work at pace to do simple, routine, repetitive work at 1–2 step instructions for extended periods say 2-hour periods in an 8-hour day.'"); *Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *14 (D.S.C.

Aug. 19, 2015) ("In *Mascio*, the ALJ concluded the plaintiff had a moderate limitation in concentration, persistence, or pace but did not include any corresponding limitation in the plaintiff's RFC, nor did the ALJ explain the reasons for not including such a limitation. In the case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'").

Here, the ALJ concluded that Plaintiff's severe impairments included anxiety and depression. Tr. at 24. At step three of the evaluation process, the ALJ considered Listings 12.04 and 12.06, but found that Plaintiff did not meet either Listing because she failed to meet the "paragraph B" or "paragraph C" criteria under the Listings. Tr. at 28–29. She specifically found that Plaintiff had mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation that were of extended duration. *Id.* She explained her finding that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace as follows:

> As discussed above, Dr. Byrd's report documents that the claimant was able to provide clear answers and think abstractly (Exhibit B3F at 2–3). However, Dr. Ruffing found that she may struggle with concentration, persistence, and pace (Exhibit B4F at 3). Accordingly, I find moderate difficulties in concentration, persistence, or pace.

Tr. at 28. The ALJ assessed an RFC and provided that it "reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." Tr. at 29. The ALJ limited Plaintiff to "simple, repetitive tasks and instructions in jobs with occasional public

contact." *Id.* She explained that she accounted for Plaintiff's "depression and anxiety by limiting her to simple, repetitive tasks and instructions with only occasional public contact." Tr. at 31. She indicated that she gave great weight to the opinions of the state agency mental RFC consultants, and referenced Exhibit B10A, which contained Dr. Clanton's mental RFC assessment. *Id.*; *see also* Tr. at 122–35. She provided that she "adopted their findings in the residual functional capacity defined above because they are consistent with the substantial evidence of record, particularly Dr. Ruffing's report and recent evidence from Dr. Eaton that the claimant's anxiety has improved." *Id.*

The undersigned recommends the court find that the ALJ adequately considered Plaintiff's moderate limitation in concentration, persistence, or pace in posing the hypothetical question to the VE and in assessing the RFC. Thus, the instant case may be distinguished from *Mascio*. Unlike the ALJ in *Mascio*, here, the ALJ included mental limitations in the hypothetical presented to the VE that were subsequently adopted in the RFC finding. *Compare* Tr. at 63–64 ("Consider someone . . . who is limited to . . . simple, repetitive tasks and instructions, and jobs with no more than occasional public contact"), *with* Tr. at 29 ("she is limited to simple, repetitive tasks and instruction in jobs with occasional public contact"). The ALJ did not err in failing to include specific mention of a moderate limitation in concentration, persistence, or pace in the hypothetical question to the VE or the RFC finding because the assessment of severity at steps two and three does not equate to a specific RFC finding at steps four and five. *See* SSR 96-8p ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of

mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.").

Unlike the ALJ in *Mascio*, this ALJ explained how she considered Plaintiff's moderate limitation in concentration, persistence, or pace in light of the evidence. The ALJ specified that, in assessing Plaintiff's RFC, she considered the "paragraph B" criteria in Listings 12.04 and 12.06, which included the moderate limitation in concentration, persistence, or pace. Tr. at 29. She indicated that she gave great weight to the opinion of state agency consultant Dr. Clanton. Tr. at 31. The ALJ's hypothetical question to the VE and her RFC finding reflect the same degree of functional limitation and the same impression as to Plaintiff's abilities as that provided by Dr. Clanton. *Compare* Tr. at 28 ("With regard to concentration, persistence, or pace, the claimant has moderate difficulties"), 29 ("she is limited to simple, repetitive tasks and instruction in jobs with occasional public contact"), 63–64 ("Consider someone . . . who is limited to . . . simple, repetitive tasks and instructions, and jobs with no more than occasional public contact"), with Tr. at 127 (assessing moderate difficulties in maintaining concentration, persistence, or pace), 132 ("Ct. has ability for at least simple routine tasks away from public.").

To further support her RFC finding, the ALJ cited evidence that she maintained supported Dr. Clanton's assessment of Plaintiff's mental abilities and limitations, including Dr. Ruffing's report and Dr. Eaton's most recent treatment notes. *See* Tr. at 31.

Although Plaintiff argues that Dr. Ruffing's report showed her to have greater restrictions than those the ALJ included in the RFC, the undersigned notes that Dr. Ruffing indicated that Plaintiff had inconsistent abilities to attend and focus based on her emotional distress level, but that she had coherent and goal-directed thought processes, normal cognitive processing speed, and scored 30 out of 30 points on the MMSE. *See* Tr. at 365. Thus, much of Dr. Ruffing's assessment suggested Plaintiff's mental functioning to be normal despite his observation that she had inconsistent abilities to attend and focus. As the finder of fact, it was the ALJ's duty to resolve the conflicting evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."). The ALJ resolved the conflicts in the evidence gathered by Dr. Ruffing and reached a conclusion regarding Plaintiff's mental residual functional capacity that she supported with the evidence of record. In light of Dr. Ruffing's indication that Plaintiff's ability to attend and focus was affected by her emotional distress level, the ALJ reasonably relied on recent evidence from Dr. Eaton that suggested Plaintiff's anxiety had improved, as this evidence suggested Plaintiff's ability to attend and focus may be less limited than it was at the time of Dr. Ruffing's examination. *See* Tr. at 31; *see also* Tr. at 415 (noting anxiety disorder to be "stable"). Therefore, the undersigned recommends the court find that the ALJ adequately considered and accommodated Plaintiff's moderate limitation in concentration, persistence, or pace by limiting her to simple, routine, and repetitive work.

2.    Treating Physician's Opinion

On May 27, 2013, Dr. Eaton completed a questionnaire regarding Plaintiff's mental condition. Tr. at 341. He indicated Plaintiff's diagnoses included anxiety and depression and that she was prescribed Ativan. *Id.* He stated psychiatric care had not been recommended. *Id.* He indicated Plaintiff was oriented all spheres; had a slowed thought process; demonstrated paranoid thought content; showed worried/anxious mood/affect; had poor attention/concentration; and demonstrated poor memory. *Id.* He stated Plaintiff exhibited serious work-related limitation in function as a result of her mental condition. *Id.* He indicated Plaintiff was unable to function due to anxiety and poor memory, but that she was capable of managing her funds. *Id.*

On August 1, 2014, Dr. Eaton indicated in a statement that he had treated Plaintiff for about eight years and had last treated her on March 10, 2014. Tr. at 418. He wrote the following:

> Ms. Helms suffers from a number of conditions that would cause her work related limitations. She has arthritis in her lumbar spine, as shown on a 8/11 MRI. She has generalized peripheral neuropathy. In 2011, Dr. Collings conducted nerve studies that confirmed her neuropathy. She also suffers from mild to moderate sleep apnea, fibromyalgia and obesity. She presents as stressed out and consistently complains of chronic widespread pain. Based on her imaging and testing, as well as her presentation in the office, it is consistent with her condition that she would have difficulty completing a whole 8 hour work day. The combination of her problems would probably cause her difficulty persisting through a whole 8 hour work day and maintaining a production pace.

*Id.*

Plaintiff argues the ALJ improperly rejected the work-preclusive limitations set forth in her treating physician's opinion. [ECF No. 11 at 14]. She maintains the ALJ

failed to consider the length of her treatment relationship with Dr. Eaton. *Id.* at 16. She contends that the objective evidence supported Dr. Eaton's opinion and that his opinion was not undermined by his indications that her anxiety was stable. *Id.* at 17. Plaintiff argues that the consultative examiners' opinions do not contradict that of Dr. Eaton. *Id.* at 20. She maintains that the ALJ neglected to explain the inconsistencies she perceived between Dr. Eaton's opinion and the other evidence of record and failed to explain how the objective findings showed Plaintiff's symptoms to be stable. [ECF No. 13 at 10–12].

The Commissioner argues the ALJ properly gave little weight to Dr. Eaton's opinions. [ECF No. 12 at 13]. She maintains that the ALJ properly considered Dr. Eaton's treatment relationship with Plaintiff. *Id.* at 14. She contends that Dr. Eaton's opinions were not supported by the evidence of record. *Id.* at 15. She argues that the ALJ relied upon indications of Plaintiff's stability in the proper context. *Id.* at 16. Finally, she maintains that the consultative examiner's reports do not support the extreme limitations suggested by Dr. Eaton. *Id.*

ALJs are required to consider and evaluate every medical opinion of record. 20 C.F.R. §§ 404.1527(b), (c), 416.927(b), (c), SSR 96-5p. The regulations direct that ALJs give controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating source's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ is not required to give it controlling weight,

but must proceed to weigh the treating physician's opinion, along with all other medical opinions of record, based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

ALJs are guided in weighing the factors by the specific provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v.*

*Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4]

Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

ALJs are not required to expressly discuss each factor set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ summarized Dr. Eaton's first statement as follows:

On May 27, 2013, Dr. Eaton completed a medical source statement. He opined that the claimant has slowed thought processes, worried mood, anxious affect, and poor memory, attention and concentration. He also opined that she has a serious work-related limitation in function due to anxiety and depression (Exhibit B1F).

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

Tr. at 25. She quoted Dr. Eaton's second statement in the decision. Tr. at 26. She then explained that she gave little weight to Dr. Eaton's opinions because his "treating notes do not support such extreme limitations and contain very little objective evidence" and because "his opinions are inconsistent with his own treating notes showing that the claimant's anxiety has improved." Tr. at 31. She further indicated Dr. Eaton's opinions were "inconsistent with the opinions and reports offered by Dr. Byrd, Dr. Ruffing, and the State agency consultants." *Id.*

Because Dr. Eaton was Plaintiff's treating physician, a presumption exists that his opinion should carry controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ cited ample evidence to overcome that presumption by pointing out that Dr. Eaton's opinion was not well-supported by medically-acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the case record. *See* Tr. at 31; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Having overcome the presumption that Dr. Eaton's opinion was entitled to controlling weight, the ALJ was required to reconsider and weigh Dr. Eaton's opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Although Plaintiff argues the ALJ did not adequately consider the length of her treatment relationship with Dr. Eaton, a review of the decision does not support this finding. The ALJ specifically quoted Dr. Eaton's opinion in the decision, including the portion where he indicated he had treated Plaintiff for "about eight years." Tr. at 26. A review of the decision as a whole yields significant evidence to suggest the ALJ considered the treatment relationship between Plaintiff and Dr. Eaton. *See* Tr. at 25–26

(summarizing Plaintiff's visits with Dr. Eaton on November 8, 2012, May 27, 2013, and March 10, 2014 and recounting Dr. Eaton's opinions dated May 27, 2013 and August 1, 2014), 31 (explaining reasons for giving little weight to Dr. Eaton's opinions and noting the recent evidence from Dr. Eaton suggested Plaintiff's anxiety had improved).

The ALJ addressed the supportability of Dr. Eaton's opinion in his own records by indicating that "Dr. Eaton's treating notes do not support such extreme limitations and contain very little objective evidence" and that "his opinions are inconsistent with his own treating notes showing that the claimant's anxiety has improved." Tr. at 31. A review of Dr. Eaton's treatment notes reveals the ALJ's consideration of the supportability factor to be sustained by substantial evidence. *See* Tr. at 346–47 (no objective findings aside from a test negative for prescribed medication), 348 (Plaintiff complained of pain, but Dr. Eaton's records reveal no objective findings), 369 (Plaintiff complained of diffuse joint pain and paresthesias in her hands and feet, but reported improved hypertension, reflux, and anxiety symptoms; Dr. Eaton observed normal ROM of Plaintiff's extremities, but Plaintiff complained of increased pain with ROM of her neck and back), 415 (Plaintiff complained of chronic pain in her arms and legs; Dr. Eaton noted that Plaintiff's hypertension and anxiety were stable).

Plaintiff points to cases that suggest notations of stability do not necessarily equate to a finding that an individual can engage in substantial gainful activity. [ECF No. 11 at 7–8]. The undersigned is guided by the principle that indications that an individual's impairment is stable should be viewed in the context of the record as a whole. *See Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir. 1986) ("the isolated references in the

physician's notes to 'feeling well' and 'normal activity' are not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitations" in the face of "medical evidence of an impairment that could be expected to produce such symptoms"). However, in this case, Dr. Eaton's records show few objective findings or details regarding the nature and extent of Plaintiff's impairments, and a review of the record as a whole does not suggest that the indications of improvement and stability were taken out of context.

The ALJ also addressed the consistency factor when she noted that Dr. Eaton's opinions were inconsistent with the opinions and reports from Dr. Byrd, Dr. Ruffing, and the state agency consultants. Tr. at 31. Although Plaintiff argues that the ALJ did not adequately consider Dr. Byrd's and Dr. Ruffing's observations regarding her anxiety, this court is prohibited from reweighing the evidence unless the ALJ's conclusion is unsupported by substantial evidence. *See Walls*, 296 F.3d at 290 ("In assessing whether there is substantial evidence, the reviewing court should not 'undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of' the agency."), citing *Mastro*, 270 F.3d at 176. The undersigned's review of the reports of Dr. Byrd, Dr. Ruffing, and the state agency consultants does not yield evidence that renders the ALJ's determination unsupported by substantial evidence. Although Dr. Byrd, Dr. Ruffing, and the state agency physicians acknowledged that Plaintiff presented with symptoms of anxiety, they did not suggest she was limited to the extent suggested by Dr. Eaton. *See* Tr. at 97 (Dr. Horn indicated Plaintiff "has ability for at least simple routine tasks away from public."), 100–02 (Dr. Horn recognized moderate limitations in

31

Plaintiff's abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; and to interact appropriately with the general public.), 128 (Dr. Clanton indicated Plaintiff had the ability for "at least simple routine tasks away from public") 131–33 (Dr. Clanton assessed Plaintiff as having moderate limitations in her abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to interact appropriately with the general public), 359–60 (Dr. Byrd described Plaintiff as very depressed, tearful, and in mild distress, but noted she gave clear answers; had knowledge within normal limits; could name three objects without difficulty; was able to subtract by threes from 100 slowly, but without much difficulty; was able to correctly compute change for a scenario involving a monetary transaction; and demonstrated normal abstract thinking ability), 365 (Dr. Ruffing stated Plaintiff had inconsistent abilities to attend and focus based on her emotional distress level, but demonstrated coherent and goal-directed thought processes, showed normal cognitive processing speed, and scored 30 out of 30 points on the MMSE). Plaintiff essentially argues that because Dr. Ruffing and Dr. Byrd observed Plaintiff to demonstrate symptoms of anxiety, the ALJ should have found that their opinions supported Dr. Eaton's opinion. However, the undersigned notes that the ALJ found that anxiety was among Plaintiff's severe impairments and imposed limitations to address her anxiety. *See* Tr. at 31 ("Finally, I accounted for her depression and anxiety by limiting her to simple, repetitive tasks and instructions with only occasional public contact."). In

light of the foregoing, the undersigned recommends the court find the ALJ considered Dr. Eaton's opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and supported her conclusion to accord little weight to the opinion with substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

January 5, 2016                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).